# Declaration in Support of Forfeiture Complaint

## I. Purpose of the Declaration

This Declaration is submitted in support of a civil forfeiture complaint that names the following real property as defendant property:

a. **Real property located at 1460 River Way Drive, Keymar, Maryland, 21757 in the name of SHAUN and JOANNE TUCKER ("1460 River Way Drive"); and**

b. **Real property located at 2325 N. Feeser Road, Taneytown, Maryland 21787, in the name of QUANTELL, INC.**

Your affiant submits that there is reason to believe that the government will be able to meet it's burden at trial to prove that (a) more than $10,000 in proceeds derived from a specified unlawful activity were used to make renovations and improvements to the real property located at 1460 River Way Drive and (b) proceeds derived from a specified unlawful activity were used to make mortgage payments relating to the real property located at 2325 Feeser Road, Taneytown, Maryland 21787. Therefore, your affiant submits that this real property should be forfeited to the United States of America, pursuant to 18 U.S.C. §§ 1343, 1349, 981(a)(l)(A) &(a)(1)(C), 1956(c)(7), as there is reason to believe that the government will be able to meet its burden at trial to prove that this real property constitutes, or is traceable to, proceeds of a specified unlawful activity. Furthermore, 1460 River Way Drive should be forfeited because it represents real property involved in a violation of 18 U.S.C. § 1957 pursuant to 18 U.S.C. § 982(a)(1) .

## II. Affiant

Your affiant, Cam Costello, is a Special Agent with IRS CI, and has been employed in such capacity since April 2004. Your affiant's responsibilities include the investigation of possible criminal violations of the Internal Revenue Code (Title 26, United States Code), the

Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code), and other related offenses.

Your affiant received a Master's Degree in Business Administration from Hood College and a Bachelor's Degree in Accounting from Wilmington College. Your affiant is also licensed as a Certified Public Accountant. In October 2004, your affiant completed six months of Special Agent Basic Training (SABT) at the Federal Law Enforcement Training Center (FLETC) located in Glynco, Georgia. The training consisted of the Criminal Investigator Training Program (CITP) which provides training specifically on the laws and procedures of searches and seizures, arrests, and investigative techniques. The training additionally consisted of the Special Agent Investigative Techniques (SAIT) course which focuses on the areas of tax law and methods of financial investigations.

Predicated on knowledge, training, experience and participation in investigations, your affiant knows that when individuals involved in criminal activities accumulate large amounts of proceeds, they attempt to legitimize the money through transfers between accounts and investments in various assets such as securities, stocks, and real estate.

## III. Facts

On March 28, 2013, federal search and seizure warrants were executed at multiple locations, including 1460 River Way Drive. In issuing the warrants, a United States Magistrate Judge found probable cause to believe that evidence of Conspiracy, ERISA Embezzlement, Tax Fraud, Bank Fraud, and Money Laundering, in violation of 18 U.S.C. §§ 371, 664, 1344, 1957; and 26 U.S.C. § 7201, would be located at the River Way Drive residence. See 13-0600-SAG. On or about September 16, 2014, a federal grand jury charged Shaun and Joanne Tucker with

ERISA embezzlement and Tax Evasion, in violation of 18 U.S.C. Section 664, and 26 U.S.C. Section 7201.

Based on evidence uncovered in the federal investigation, federal agents currently have evidence that Shaun Tucker, Joanne Tucker, Jonathan Mickle, Kevin Williams, Paul Watson, and others participated in a conspiracy to knowingly devise a scheme and artifice, namely:

(a) to defraud the United States and obtain more than $10,000,000, by means of materially false and fraudulent pretenses, representations and promises regarding the eligibility of Quantell and Intaset for federal contract awards, the past performances of Quantell and Intaset, and the revenues, ownership, affiliated entities, equity interests, and control of Quantell and Intaset; and

(b) to defraud certain employees of Quantell and Intaset, the United States, and the ERISA Plans, of money, benefits, and property by means of materially false and fraudulent pretenses, representations and promises regarding benefits required by the SCA, the use of SCA funds, and compliance with the SCA and ERISA;

and for the purpose of executing such a scheme and artifice to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce, certain writings, signals, pictures, and sounds, in violation of 18 U.S.C. Section 1343.

In connection with the federal procurement fraud aspects of the conspiracy, federal agents have evidence that on or about September 23, 2011, the U.S. Department of Defense awarded Quantell, Inc. ("Quantell") a contract for medical services to be provided in the vicinity of Camp Lejeune, North Carolina. The U.S. Navy Contract No. is N00189-11-C-Z060. The contract was a set-aside contract that required bidders to self-certify as a Service Disabled Veteran Owned Small Business ("SDVOSB"). Federal agents have witness testimony and documentary evidence (including interstate wires) that Shaun Tucker and Joanne Tucker, and their co-conspirators, caused Paul Watson, who was a service disabled veteran, to fraudulently

represent himself as Quantell's President, majority owner, and chairman of the board of directors, and to further claim that he received the majority of Quantell's annual distribution of profits, when the Tuckers then and there knew that was not true. Contrary to the information provided to the federal government when Quantell bid on the contract, Shaun and Joanne Tucker owned and controlled Quantell in 2011.[1]

Moreover, federal agents have evidence that in bidding on this contract, Shaun Tucker, Joanne Tucker, and Quantell claimed to the U.S. Department of Defense false and fraudulent information about past performance by Quantell, including listing a fake company called "Staff-It" with a fake contact person named "John Sturpolis," and providing favorable past performance reviews for work not actually performed by Quantell. Quantell obtained the contract through these false and fraudulent representations, which the investigation has revealed were material. As a result of this the performance on the 3-year contract, the U.S. Department of Defense paid Quantell more than $10 million.

Between in or about December 2011 and in or about May 2012, Quantell received deposits totaling $1,584,296.76 -- that correspond to payments on U.S. Navy Contract No. N00189-11-C-Z060. Each deposit was for $264,049.46 and has been traced by federal agents to disbursing vouchers provided by the Defense Finance and Accounting Service (hereafter referred to as "DFAS"), with corresponding invoice numbers submitted by Quantell for US Government

[1] Federal agents have also obtained evidence that until in or about 2010, the Tuckers controlled a company called Intaset, which handled the Camp Lejeune contract from about May 2007 until about September 2011. Pursuant to that contract, Intaset would have received approximately $8 million from the U.S. Department of Defense.

contract work. These six payments were disbursed directly from DFAS to the Quantell bank account at BB&T ending in 8539.[2]

In connection with the health and welfare benefits aspect of the conspiracy, federal agents have evidence that Shaun and Joanne Tucker and their co-conspirators obtained health and welfare benefits through false and fraudulent representations. Federal agents have identified more than $1 million paid by the federal government to Quantell and Intaset that was supposed to be used for the health and welfare benefits of the Quantell and Intaset employees pursuant to the McNamara-O'Hara Service Contract Act of 1965 (hereinafter "SCA"), 41 U.S.C § 6702 et seq. Federal agents have financial subpoena responses demonstrating that a large portion of the money paid by the federal government actually was used for the benefit of Shaun and Joanne Tucker, and the co-conspirators. The investigation has revealed, in part, the Tuckers' use of various entities with no legitimate business purpose, including MT&B, GCBS, IBS, FEDSYNC,

---

[2] About June 2012, Joanne Krcma (a.k.a. Joanne Tucker), on behalf of Quantell, entered into a line of credit agreement with the Wells Fargo Capital Finance – Government Services Group (hereafter referred to as "WFCF"). The agreement required Quantell to establish a bank account with WFCF to receive future DFAS payments. Quantell registered this new bank account (Wells Fargo Bank, N.A. account ending in 1877) with the System for Award Management (hereafter referred to as the "SAM"). The SAM is used by the Department of Defense and other federal agencies to register contractors doing business with the U.S. Government, and among other things, to effectively disburse payments to contractors for goods and services rendered. Upon completion of Department of Defense contract work, Quantell submitted invoices to DFAS for work performed within a specified time frame (i.e. monthly) and DFAS disburses payments to the BB&T bank account designated by Quantell. The payment process from DFAS to the contractor varied and was dependent upon several factors, including a review of the invoices and approval by the U.S. Government contracting authority. Beginning in or about June 2012, Quantell received multiple payments to the Wells Fargo account for work performed on various U.S. Government contracts, including Camp Lejeune. Under the agreement with WFCF, Quantell submitted invoices to DFAS for US Government contract work, Quantell alerted WFCF to purchase the invoiced amounts (less credit fees, administrative fees, and retainage), and then WFCF sent payments to an account designated by Quantell, WFCF then awaited the payments from DFAS.

and others, to convert for their own personal benefit monies intended to provide legitimate benefits for Intaset and Quantell service contract employees under the SCA. Federal agents also have evidence that from in or about July 2009 until in or about January 2010, as alleged in the pending Indictment, the Tuckers obtained more than $200,000 from health and welfare plans covered by Title I of the Employee Retirement Income Security Act of 1974, through false and fraudulent representations, namely a false and fictitious claim that Quantell and Intaset were making a plan to plan transfer of the money in the ERISA plans.

Use Of Fraud Proceeds To Renovate 1460 River Way Drive

On or about September 20, 1994, the Tuckers purchased a new home on a 1.8 acre lot located at 1460 River Way Drive, Keymar, Maryland. During 2009, the Tuckers had renovations and improvements done to the River Way Drive property totaling more than $100,000. Pine Custom Builders, Inc. (Pine Custom) oversaw the renovations and improvements of the Tuckers' residence at River Way Drive.

Between in or about May 4, 2009 and in or about March 9, 2011, more than $400,000 of Intaset SCA funds were transferred to a bank account in the name of GCBS. When the INTASET SCA monies were deposited into the GCBS account, they constituted proceeds of wire fraud, in violation of 18 U.S.C. § 1343, which is a specified unlawful activity. The money in the GCBS account was used primarily for the benefit of the Tuckers and their co-conspirators. More than $400,000 from the GCBS account also was disbursed for the benefits of the Tuckers and their co-conspirators. Your affiant's analysis of GCBS bank records found numerous checks payable to Pine Custom made directly from the GCBS account, including the three checks detailed below. Kenneth Pine has advised your affiant that his company replaced the roof and

siding at River Way, and constructed a bar in the home. The checks payable to Pine Custom were made using proceeds derived from a specified unlawful activity.

| Check Number | Posting Date | Amount |
|---|---|---|
| 7544 | July 28, 2009 | $12,000 |
| 7547 | August 6, 2009 | $10,500 |
| 7561 | August 12, 2009 | $25,000 |

Accordingly, your affiant submits there is reason to believe that the government will be able to meet its burden at trial to prove that each of the checks payable to Pine Custom described herein were made for the renovations and improvements of the TUCKERS' River Way Drive residence and involved proceeds from a specified unlawful activity.

Use Of Fraud Proceeds To Pay The Loans For 2325 N. Feeser Road, Taneytown, Maryland

On or about August 11, 2006 Quantell purchased an existing commercial building on 4.8 acres of land located at 2325 N. Feeser Road, Taneytown, Maryland 21787. The purchase price was $525,000 and was paid in cash. In March 2007, Quantell obtained more than $500,000 through a Deed of Trust from Graystone Bank (Loan #4000002880) which was secured by the Feeser Road property.[3] In July 2007, Quantell took out a second loan from Graystone Bank (Loan # 4000003630) which was also secured by the Feeser Road property (hereinafter these loans are collectively referred to as the Feeser Road loans).

Your affiant has reviewed the transactions involving the Quantell BB&T 8539 account. There are checks written on a regular basis from the BB&T 8539 account that are payable to SonaBank, beginning in approximately September 2012 and continuing through in or about June 2014. The checks reference the SonaBank Feeser Road loan numbers. Your affiant reconciled a

---

3 Graystone Bank was acquired by Harvest Bank which was later taken over by SonaBank.

three month period of checks, and found more than $13,000 in loan payments to SonaBank, as noted below:

| BB&T Check # | Amount | Clearing Date | Funds applied to Loan # Ending 2880 | Funds applied to Loan # Ending 3630 | Total Funds Applied to Feeser Road loans |
|---|---|---|---|---|---|
| 2068 | $4,434.07 | 03/11/2013 | $2,980.35 | $1,453.72 | $4,434.07 |
| 2154 | $4,434.07 | 04/26/2013 | $2,909.36 | $1,524.71 | $4,434.07 |
| 2224 | $4,434.07 | 05/21/2013 | $2,908.30 | $1,525.77 | $4,434.07 |

Accordingly, your affiant submits there is reason to believe that the government will be able to meet its burden at trial to prove that the checks above constituted proceeds of a wire fraud, and that they were used to make payments on the loans secured by the Feeser Road property.[4]

**IV.** Relevant Legal Authority:

Your affiant is aware of the following legal statutes that collectively authorize the forfeiture of real property constituting proceeds from a specified unlawful activity and/or containing such proceeds:

> 18 U.S.C. Section 981(a)(1)(A) provides in relevant part for the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

> 18 U.S.C. Section 981(a)(1)(C) provides in relevant part for the forfeiture of "[a]ny property . . . which constitutes or is derived from proceeds traceable to a violation of . . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title) . . . ."

> 18 U.S.C. section 1956(a)(l)(B)(i) provides that "[w]hoever, knowing that the property involved in a financial transaction, represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact

[4] This property includes the current office location for Quantell, as well as a single family residence built on the property in or about 2007.

> involves the proceeds of specified unlawful activity ... knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . [shall have committed an offense].
>
> 18 U.S.C. Section 1956(c)(7) incorporates offenses enumerated in Section 1961 as specified unlawful activities. Section 1961 lists defines "racketeering activity" as including embezzlements from employee benefit plans, in violation of 18 U.S.C. Section 664.
>
> 18 U.S.C. Section 982(a)(1) requires a court, when sentencing a person for a violation of 18 U.S.C. Section 1957, to order "that the person forfeit to the United States any property . . . involved in such offense, or any property traceable to such property."

## V. **Conclusion**

Based on the foregoing, your affiant submits that there is reason to believe that the government will be able to meet its burden at trial to prove that

(i) the real property located at 1460 River Way Drive was renovated and improved using more than $10,000 in proceeds from a specified unlawful activity;

(ii) The loan payments for the property at 2325 N. Feeser Road, Taneytown, Maryland, were paid with more than $10,000 in proceeds from a specified unlawful activity;

(iii) that this real property constitutes proceeds derived from, or directly or indirectly traceable to a specified unlawful activity, and therefore, should be forfeited to the United States of America pursuant to 18 U.S.C. §§ 1343, 981(a)(l)(A) &(a)(1)(C), and 1956(c)(7);

(iv) 1460 River Way Drive is property involved in a violation of 18 U.S.C. § 1957 and thus should be forfeited pursuant to 18 U.S.C. § 982(a)(1).

I declare, under penalty of perjury as provided in 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge and belief.

Date: February 18, 2015.

Cam Costello
Special Agent
Internal Revenue Service
Criminal Investigation